IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION


SWEENEY  GILLETTE,  KENDRA                      Case No.  2:14-CV-01542-SU
GILLETTE, and RICHARD HOYT,
                                                              FINDINGS AND
        Plaintiffs,                                      RECOMMENDATION

v.

MALHEUR  COUNTY,  ROBERT
SPEELMAN, KIRK B. MILLER, LYNN
GIBSON,  DAWN  SCHOOLEY,  LARRY
HAYHURST,  JACK  NOBLE,  RODGER
HUFFMAN,  GREG  ROMANS,  SHERIFF
BRIAN WOLFE, TRAVIS JOHNSON, BOB
WROTEN, DR. BILL BARTON, KENNETH
HOOVER,  JEFF  ANDERSON,  6
UNKNOWN  JANE  DOES,  and  6
UNKNOWN  JOHN  DOES,  personally and
individually,

        Defendants.

_____


SULLIVAN, United States Magistrate Judge:

        Plaintiffs Sweeney Gillette, Kendra Gillette, and Richard Hoyt filed this second amended complaint


Page 1 - FINDINGS AND RECOMMENDATION

against Malheur County, fourteen government employees in Oregon, Idaho, and Colorado, and twelve

unknown defendants.  Plaintiffs allege constitutional violations pursuant to 42 U.S.C. § 1983 and pendent

state law claims.  Defendants have filed motions to dismiss the second amended complaint for "failure to

state a claim" in accordance with Federal Rule of Civil Procedure 12(b)(6) and Rule 8, and lack of

jurisdiction.  Plaintiffs oppose the motions.  For the following reasons, plaintiffs' federal claims should be

dismissed with prejudice.  With the federal claims dismissed, the Court lacks a sound basis for exercising

supplemental jurisdiction over the remaining state claims.  The state claims should be dismissed without

prejudice.

## PROCEDURAL BACKGROUND

Plaintiffs filed their initial complaint on September 26, 2014 and filed a first amended complaint on

November 19, 2014.  Compl. (Doc. #1); 1st Am. Compl. (Doc. #5).  This Court dismissed the first

amended complaint for failure to comply with Federal Rule of Civil Procedure 8, which requires a "a short

and plain statement of [each] claim showing that the pleader is entitled to relief" and that "each allegation

must be simple, concise, and direct."  Fed. R. Civ. P. 8(a)(2) & 8(d)(1).  The Court determined that the

first amended complaint was "so verbose, confused and redundant that its true substance, if any, [was] well

disguised."  Order on Mot. Dismiss 1st Am. Compl., at 8 (Doc. #42) (quoting *Hearns v. San Bernardino*

*Police Dep't*, 530 F.3d 1124, 1131 (9th Cir. 2008)).  The Court, however, granted leave to amend.  On

June 15, 2015, plaintiffs filed the present second amended complaint ("SAC").  2d Am. Compl. (Doc.

#43).  The SAC provides a clearer factual narrative but remains lengthy—68 pages long—and confusing.[1]

_____

[1]  Among the many deficiencies in the 68-page complaint, plaintiffs begin their statement of each
legal claim by incorporating "each and every allegation and averment set forth" in all the previous

The SAC names as defendants Malheur County, Malheur County Sheriff Brian Wolfe, Malheur County Sheriff's sergeant Robert Speelman, and four deputies, Travis Johnson, Greg Romans, Bob Wroten, and Jeff Anderson. Plaintiffs name four Idaho Department of Agriculture employees, Lynn Gibson, Dawn Schooley, Larry Hayhurst, and Bill Barton as well as two Oregon Department of Agriculture employees, Jack Noble and Roger Huffman. The SAC names an Idaho U.S. Department of Agriculture ("USDA") investigator, Kirk Miller, and a Colorado USDA investigator, Kenneth Hoover. The SAC also names twelve unidentified "Doe" defendants. 2d Am. Compl., at 3-6 (Doc. #43). Plaintiffs allege that all defendants violated their constitutional rights and committed several state law torts during a multi-year investigation of plaintiffs for alleged cattle theft.

All defendants have filed motions to dismiss based upon Rule 8 and Rule 12(b)(6) failure to state a claim. Oral argument took place on January 15, 2016. The Court allowed plaintiffs' attorney to file a supplemental brief supporting various arguments made at oral argument. All defendants were permitted to respond. Tr. at 110 (Doc. #75).

---

paragraphs "as though set forth fully herein." 2d Am. Compl., at 24-25, 28, 30, 34, 39, 44, 46, 49, 51, 52, 55, 56. By incorporating 20-50 pages of rambling and often irrelevant factual allegations into every claim, plaintiffs employ practices associated with improper "shotgun pleading." *Sollberger v. Wachovia Sec., LLC*, 2010 WL 2674456, at *4 (C.D. Cal. June 30, 2010); *Savage v. Tweedy*, 2012 WL 6618184, at *5 (D. Or. Dec. 13, 2012); s*ee Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011); *see Autobidmaster, LLC v. Alpine Auto Gallery, LLC*, 2015 WL 2381611, at *15 (D. Or. May 19, 2015). Here, although plaintiffs engage in this practice in their statement of each legal claim, they follow the incorporation of general allegations with paragraphs that give some indication of their argument and relevant facts. In doing so, plaintiffs indicate which general areas of the incorporated morass of factual allegations pertain to each claim. To some extent, this reduces the burden on the Court and defendants to hunt through 68 pages of allegations for facts pertinent to each claim. Thus, unlike plaintiffs' first amended complaint, the SAC makes it possible for the Court to at least consider plaintiffs' arguments and the supporting allegations. However, arguably the SAC still falls short of Rule 8's requirement of a "short and plain statement" of claims.

Page 3 - FINDINGS AND RECOMMENDATION

## FACTUAL BACKGROUND

As this is a Rule 12(b)(6) motion to dismiss, the Court must assume all facts alleged in the complaint are true and view them in a light most favorable to plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, the Court need not accept as true plaintiffs' conclusory statements, threadbare recitation of the elements of their claims, or legal conclusions. *Iqbal*, 556 U.S. at 678. Accordingly, the Court summarizes pertinent facts and allegations as follows.

Plaintiffs Sweeney and Kendra Gillette, a married couple, and plaintiff Richard Hoyt, Kendra Gillette's father, resided in Malheur County during the events that gave rise to the SAC. 2d Am. Compl., at 2-3 (Doc. #43). The Gillettes bought and sold cattle, owned a feedlot in Malheur County, and pastured cattle in Oregon, Idaho, and Nevada. 2d Am. Compl., at 2, 8, 13, 16. Hoyt owned a trucking business which transported the Gillettes' cattle. 2d Am. Compl., at 2. Defendants include the sheriff of Malheur County and several employees of the department. Other defendants are government officials and inspectors whose duties relate to inspecting and certifying cattle in accordance with federal and state law and administrative regulations. Both Oregon and Idaho law require that cattle be inspected for ownership at various times, including when they change ownership, cross state lines, and before slaughter. *See* Or. Rev. Stat. § 604.046(1); Idaho Code §§ 25-1120, 25-1121. The ownership inspections, generally called brand inspections, are aimed at catching and preventing theft. In addition, Oregon and Idaho as well as the USDA require health inspections and grant veterinarians and health inspectors broad authority to enter private property and inspect and manage cattle for disease. *See* Idaho Code § 25-210; Or. Rev. Stat. §§ 596.020, 596.341, 596.388; OAR 603-011-0255; 7 U.S.C. §§ 8307, 8708.

According to the SAC, plaintiffs had publicly advocated for the USDA to discontinue the current

Page 4 - FINDINGS AND RECOMMENDATION

system of tracking cattle using brands and government brand inspectors in favor of a system of electronic identification through ear-tags. 2d Am. Compl., at 14, 49; Sweeney Gillette Decl., at 1-3. Plaintiffs allege that they publicly expressed their opinions in "various forums, including newspapers, letters in support of legislation, statements made directly to the head of the Oregon Department of Agriculture (at Cattlemen's Association Meetings)" which were also attended by defendants Huffman, Miller, and Hoover. 2d Am. Compl., at 49-50. Plaintiffs allege that all defendants opposed plaintiffs' opinions and investigated and harassed plaintiffs in retaliation for the opinions, in order to protect their own interests. 2d Am. Compl., at 49-50. Specifically, the SAC states that in a September 2011 newspaper letter and at a December 2011 Cattlemen's Association meeting, Kendra Gillette publicly advocated for an electronic identification system for livestock.[2] 2d. Am. Compl., at 14. However, plaintiffs allege some of the defendants began investigating them as early as July 2010 and that the multi-agency investigation began December 2010. 2d Am. Compl., at 7; Pls.' Suppl. Br., at 4 (Doc. #76).

Plaintiffs assert that defendants "acted jointly as members and associates of the Malheur County 'Oregon Livestock and Rural Crime Investigation Association'" and investigated plaintiffs over several years but never charged them with a crime. 2d Am. Compl., at 30-31, 35. Starting in 2010, defendants allegedly performed unnecessary and intrusive health and brand inspections on plaintiffs' cattle while they

---

[2] The SAC's only specific allegations of protected speech are that Kendra Gillette wrote a newspaper letter to the editor that was published on September 27, 2011 and expressed her opinions at a December 2011 Cattlemen's Association meeting. 2d Am. Compl., at 14; *see* Kendra Gillette Decl. Ex. 1, at 15-16 (Doc. #77-1) (although the SAC identifies Kendra Gillette's writing in the Argus Observer as an "article," this submission shows it was a letter to the editor) .

were in transit, pastured, awaiting slaughter, and after lease and sale to third parties and did so on repeated

occasions. *See, e.g.,* 2d Am. Compl., at 8, 9, 11-13, 15-17, 19.  Plaintiffs allege that during inspections,

defendants applied excessive force in handling and shaving cattle to view branding marks, resulting in the

death and devaluation of many animals. *See, e.g.,* 2d Am. Compl., at 8, 12, 14, 19, 37.  Plaintiffs also

allege that defendants used false information to obtain surveillance and search warrants for plaintiffs'

property.  2d Am. Compl., at 7, 16-17, 39.  Plaintiffs allege the Malheur County Sheriff's Office, the

Oregon Brand Department, and the USDA executed a search warrant on September 26, 2012, searching

plaintiffs' homes and their feedlot.  2d Am. Compl., at 17.  Plaintiffs allege that defendants seized items not

listed in the search warrant and "not reasonably related to their alleged purpose of searching for evidence

of stolen cattle" and failed to return items despite a court order.  2d Am. Compl., at 37. [3]

Plaintiffs allege that, in the course of the investigation, defendants repeatedly defamed plaintiffs and

encouraged plaintiffs' business contacts to end their relationships with plaintiffs.  2d Am. Compl., at 8-9,

14-17, 19, 20-21, 23.  Several of plaintiffs' claims concern their "contractual relationship with D.L. Evans

Bank, with which Plaintiffs had a contract providing for loans for the purpose of buying and selling cattle."

2d Am. Compl., at 25.  Plaintiffs allege that one of the Malheur County defendants, Speelman, "provided

false information that Plaintiffs were being investigated for cattle theft and that they would soon be charged

with crimes and suggested the bank should secure its interest in the cattle."  2d Am. Compl., at 56.

---

[3]  Despite allegations that all defendants were involved, none of the individual defendants are specifically alleged to have executed the search warrant.  In their supplemental brief, plaintiffs supplied a list of individuals that were allegedly requested to be present at the execution of the warrant.  Pls.' Suppl. Br., at 3 (Doc. #76).

Plaintiffs allege that, as a result of Speelman's encouragement, the bank accelerated plaintiffs' loan and repossessed their cattle in January 2013, resulting in more than $500,000 in losses for the plaintiffs. 2d Am. Compl., at 19-20. Plaintiffs allege that Idaho state health and brand inspectors participated in the bank's seizure and the subsequent relocation of plaintiffs' cattle from Oregon to Idaho. 2d Am. Compl., at 19-20.

Essentially, plaintiffs factual allegations can be summarized as: (1) retaliation by defendants against plaintiffs for statements made by plaintiffs; (2) an investigation by defendants which resulted in damages to plaintiffs' business; (3) a conspiracy by defendants to obtain and execute illegal search warrants on plaintiffs' property; and (4) defendants' interference with plaintiffs' business relations with their lending bank which resulted in repossession of plaintiffs' cattle and damage to their business. Based on these factual allegations, plaintiffs allege constitutional violations under the First, Fourth, and Fourteenth Amendments, a conspiracy among all defendants to violate their constitutional rights as well as a failure by all defendants to intercede on their behalf to prevent such constitutional violations. Plaintiffs also allege supervisory and municipal liability. In addition, plaintiffs allege pendent state claims of trespass to chattel, conversion, negligence, tortious interference with business relations, and intentional infliction of emotional distress.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). If the plaintiff fails to "state a claim upon which relief can be granted," defendants may move to dismiss the complaint or

individual claims under Rule 12(b)(6).  Fed. R. Civ. P. 12(b)(6), 8(a)(2).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.  "This standard does not rise to the level of a probability requirement, but it demands 'more than a sheer possibility that a defendant has acted unlawfully.'"  *Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, 641 (9th Cir. 2014) (quoting *Iqbal*, 566 U.S. at 678).  A plaintiff need not detail all factual allegations, but the complaint must provide "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Nor may plaintiffs provide merely "a formulaic recitation of the elements of a cause of action" or "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above a speculative level." *Id.*  While the court must assume all facts alleged in a complaint are true and view them in a light most favorable to the nonmoving party, it need not accept as true any legal conclusion set forth in the complaint. *Iqbal*, 556 U.S. at 678.

## DISCUSSION

### I.  The Federal Constitutional Claims

The Court first considers plaintiffs' nine federal constitutional claims brought under 42 U.S.C. § 1983.  The SAC lists twenty-seven defendants, specifically seven Malheur County defendants, four Idaho state employees, two Oregon state employees, two  federal employees, and twelve unnamed "Doe" defendants.  Before analyzing each of the nine federal claims, the Court notes that plaintiffs have failed to state claims against fourteen defendants.

**A. Dismissal of Claims Against Barton, Noble, and "Doe" Defendants**

In their supplemental brief, plaintiffs concede that they lacked evidence against defendant Bill Barton, an Idaho state employee, and defendant Jack Noble, an employee with the state of Oregon. Pls.' Suppl. Br., at 10 (Doc. #76). They agree to dismiss them from the suit. Pls.' Suppl. Br., at 10 (Doc. #76). Accordingly, all federal claims against these two defendants should be dismissed.

Additionally, the SAC lists twelve unidentified "Doe" defendants but does not allege any conduct by those defendants or provide any detail about them. At oral argument, plaintiffs acknowledged that they had not made any allegations concerning the "Doe defendants." Tr., at 53-54. Plaintiffs declined the Court's offer to make allegations in a supplemental pleading, and agreed that the claims against Doe defendants could be dismissed. Tr., at 54. Accordingly, all claims against the twelve Doe defendants should be dismissed for failure to state a claim.

In sum, all federal claims against Barton, Noble, and "Doe" defendants should be dismissed.[4] The Court makes no recommendations concerning the state claims against those defendants, because as

---

[4] Idaho defendants also seek dismissal of claims against defendant Larry Hayhurst, arguing the Court lacks personal jurisdiction over him. Idaho Defs.' Mot. Dismiss, at 21 (Doc. #50). In constitutional tort cases and state law tort cases, the minimum contacts requirements can be satisfied by a showing that the defendant "purposefully directed" his allegedly tortious activities at the forum state. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985); *see Walden v. Fiore*, 134 S. Ct. 1115, 1122-23 (2014). Plaintiffs allege that they called Hayhurst during the bank repossession and asked him to stop his brand inspector employees from shaving cattle to verify brands. 2d Am. Compl., at 19 (Doc. #43). Hayhurst allegedly replied that cattle "would be shaved anyway and that they were going to 'get to the bottom of this.'" 2d Am. Compl., at 19. This allegation is sufficient to establish that Hayhurst, who presumably was aware defendants resided in Oregon, purposefully directed his activities at the forum state.

explained below, the Court declines to exercise supplemental jurisdiction over the state claims.

**B.  Analysis of Plaintiffs' Constitutional Claims**

As for the remaining defendants, plaintiffs bring federal constitutional claims against them under 42 U.S.C. § 1983.  Section 1983 provides a private right of action for plaintiffs against defendants, who acting under color of state law, deprive plaintiffs of rights secured by the U.S. Constitution.  *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986); *WMX Technologies, Inc. v. Miller*, 80 F.3d 1315, 1318 (9th Cir. 1996) *on reh'g en banc*, 104 F.3d 1133 (9th Cir. 1997) ("*WMX II*").  In their motion to dismiss, federal defendants argue correctly that plaintiffs cannot sue them under 42 U.S.C. 1983 as the statute does not create a right of action against federal officials acting under color of federal law.  Defs.' Miller Hoover Mot. Dismiss, at 7 (Doc. #55) (citing *Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1257 (9th Cir. 2008)).  Accordingly, for the purposes of these motions to dismiss, the Court construes plaintiffs' claims against federal defendants as claims brought under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

In the SAC, plaintiffs identify their federal claims as follows: (1) "deprivation of First, Fourth, and Fourteenth Amendment Due Process Liberty Interest in plaintiffs' right to conduct business, to income, personal property, and contractual business relationship with their bank (against all defendants)"; (2) "Fourth Amendment civil rights violations unlawful search and seizure (against all defendants)"; (3) "failure to intercede on plaintiffs' behalf and prevent the violation of their constitutional rights cognizable under 42 U.S.C. § 1983" (against all defendants); (4) "conspiracy to violate civil rights (against all defendants)"; (5)

"improper execution of a warrant (against all defendants)"; (6) "providing false information in the warrant process (against Malheur County defendants)"; (7) "supervisory liability (Sheriff Wolfe)"; (8) "municipal liability (Malheur County)"; (9) "violation of the First Amendment (all defendants)." 2d Am. Compl., at 24-51.

### (1) Due Process Liberty Interest

In their first claim, plaintiffs allege that all defendants deprived them of a constitutionally protected liberty interest by contacting plaintiffs' bank, defaming plaintiffs to bank officials, and assisting with the bank's seizure of plaintiffs' assets. 2d Am. Compl., at 24-25. Plaintiffs state this claim as "deprivation of First, Fourth and Fourteenth Amendment Due Process Liberty Interest in plaintiffs' right to conduct business, to income, personal property, and contractual business relationship with their bank." 2d Am. Compl., at 24. The Fifth and Fourteenth Amendments provide that federal and state governments, respectively, shall not deprive any person of "life, liberty or property without due process of law." However, the First Amendment does not contain a due process clause nor does it protect or confer on plaintiffs any "right to conduct business, to income, personal property, [or] contractual business relationship with their bank." It is unclear why plaintiffs cite the First and Fourth Amendments as a source of their Due Process liberty claim, and they fail to make any argument in their description of the claim that would implicate the First or Fourth Amendments. Insofar as plaintiffs make out any allegations concerning the First Amendment, they do so in their "Ninth Cause of Action" for "Violation of the First Amendment." As for the Fourth Amendment, they bring several other claims invoking it more appropriately. Accordingly,

the Court construes plaintiffs' first claim as a Due Process liberty interest claim under the Fifth and Fourteenth Amendments.

Plaintiffs specifically invoke their protected liberty interest under the Due Process Clause. In limited circumstances, government conduct that publicly defames or stigmatizes an individual may deprive that person of a liberty interest protected by the Due Process Clause of both the Fifth and Fourteenth Amendments. Courts apply the so-called "stigma-plus" test to determine whether defamatory conduct rises to the level of a constitutional deprivation. Under the test, a plaintiff must establish that the government conduct at issue not only damaged plaintiff's reputation but altered his legal status or rights. *WMX Tech., Inc. v. Miller*, 197 F.3d 367, 376 (9th Cir. 1999) ("*WMX IV*") (citing *Paul v. Davis*, 424 U.S. 693, 708-10 (1976)). The Ninth Circuit explained, "the government does not, simply by the act of defaming a person, deprive him" of constitutionally protected liberty or property interest "absent some adverse impact on some other legally cognizable interest." *Demery v. Arpaio*, 378 F.3d 1020, 1038-39 (9th Cir. 2004) (interpreting *Paul*, 424 U.S. at 708-10). This adverse impact is the "plus" element of the test.

The Ninth Circuit has made clear that this element requires an "injury directly caused by the Government, rather than an injury caused by the act of some third party." *WMX II*, 80 F.3d at 1320; *Am. Consumer Pub. Ass'n, Inc. v. Margosian*, 349 F.3d 1122, 1126 (9th Cir. 2003); *Fetsch v. City of Roseburg*, 2013 WL 2631495, at *7 (D. Or. June 11, 2013). Examples where the "plus" element was met include government termination of an employee on charges so stigmatizing they foreclosed the employee from finding other work, *see Campanelli v. Bockrath*, 100 F.3d 1476, 1478-79 (9th Cir.

1996); and the state's wrongful inclusion of plaintiffs on an index of suspected child abusers that precluded them, under state law, from various occupations involving children, *see Humphries v. Cnty. of Los Angeles*, 554 F.3d 1170, 1185 (9th Cir. 2009), *rev'd on other grounds,* 562 U.S. 29 (2010).  A chain-reaction argument that government defamation indirectly caused plaintiffs harm does not satisfy the stigma-plus test.  Plaintiffs cannot establish a constitutional deprivation by showing that alleged government defamation encouraged or prompted a third-party to injure plaintiffs.  *WMX II*, 80 F.3d at 1320.  At most, such allegations may state a claim for defamation under state law and not the U.S. Constitution which "deals with large concerns of the governors and the governed but... does not supplant traditional tort law." *Daniels v. Williams,* 474 U.S. 327, 332 (1986) (citing *Paul*, 424 U.S. at 701).  Accordingly, courts have dismissed Section 1983 claims in which plaintiffs allege that government actors defamed them, resulting in third parties—such as employers, customers, or business associates—responding by harming plaintiffs' rights or interests.  *See, e.g., Am. Consumer Pub. Ass'n*, 349 F.3d at 1126 (allegation that Oregon officials' defamatory statements during an investigation of plaintiff's business damaged the business's morale and led to canceled orders did not satisfy the stigma-plus test); *WMX II*, 80 F.3d at 1320 & *WMX IV*, 197 F.3d at 376 (allegation that government report linking plaintiff's business to organized crime damaged business's goodwill and reputation did not establish the "plus" element); *Paul*, 424 U.S. 695-97, 714 (allegation that police flyer falsely identifying plaintiff as an "active shoplifter" impaired his employment opportunities was insufficient); *Johnson v. Barker*, 799 F.2d 1396, 1399 (9th Cir. 1986)(plaintiffs alleged sheriff and prosecutor defamed them in statements to press but plaintiffs failed to show the government

actors altered or extinguished any cognizable right or status).

Among other allegations, plaintiffs state that defendant Speelman contacted plaintiffs' bank and "provided false information that Plaintiffs were being investigated for cattle theft and that they would soon be charged with crimes and suggested the bank should secure its interest in the cattle." 2d Am. Compl., at 56, 25. The complaint further alleges that defendant Speelman "encourage[d]" the bank to repossess plaintiffs' cattle. 2d Am. Compl., at 19. Finally, plaintiffs allege that defendants "assist[ed] in the seizure of plaintiffs' property." 2d Am. Compl., at 25. While such an argument might accord with a state tort claim for defamation or interference with business relations, mere "encouragement" and "convincing" or suggestions to the bank would not establish the direct harm to plaintiffs required under the stigma-plus doctrine. *See WMX II*, 80 F.3d at 1320. Plaintiffs' allegations are frustratingly vague, incomplete, and even contradictory—especially those concerning defendants' alleged participation in the repossession of the cattle.[5]

For example, plaintiffs offer conflicting allegations that cast doubt as to whether defendants were even present during the bank's actual repossession of the cattle. In the SAC, plaintiffs allege that on "January 17, 2013, with the encouragement of Speelman, D.L. Evans Bank repossessed Plaintiffs' cattle. Lynn Gibson was in charge of shaving Plaintiffs' cattle." 2d Am. Compl., at 19. Otherwise, the SAC is vague as to what occurred and who was present. However, at oral arguments, plaintiffs' attorney

---

[5] Plaintiffs' supplemental brief does not cure this defect. Pls.' Suppl. Br., at 8 (Doc. #76).

repeatedly assured the Court that "all" the named defendants "went out and worked with the bank, helping them round up the cattle and bring them in." Tr., at 82, 81-82, 84, 86. Plaintiffs retreated from these broad allegations in their supplemental brief, offering yet another account of how the bank's repossession unfolded. In that account, plaintiffs describe defendant Gibson as shaving and inspecting plaintiffs' cattle almost a week *after* the bank repossessed them. Pls.' Suppl. Br., at 8 (Doc. #76). Not only do such contradictory allegations further undermine plaintiffs' claim, they raise concerns in the event the Court were to allow plaintiffs to replead. A plaintiff must possess a good-faith factual basis for alleging additional facts needed to cure a deficiency in a complaint.[6] *Innovative Metal Design, Inc. v. U.S. Bank Nat'l Ass'n,* 2015 WL 9434779, at \*4 (D. Or. Nov. 18, 2015), *report and recommendation adopted,* 2015 WL 9308260 (D. Or. Dec. 20, 2015) (citing *Johnson v. Hologic, Inc.*, 2014 WL 2581421, at \*5 n.6 (E.D. Cal. June 9, 2014)).

Ultimately, regardless of whether the Court credits the SAC, plaintiffs' statements at oral argument, or the supplemental brief, plaintiffs fail to state a claim. To do so, plaintiffs must establish that defendants' conduct exceeded the proper bounds of their duties as cattle inspectors and keepers of the peace. To that end, plaintiffs offer no helpful details as to how defendants actually participated in the bank's foreclosure of plaintiffs' loan and repossession of their assets. Nor do plaintiffs provide necessary background on the nature of the bank's actions. Although the Court must view facts in a light most favorable to the plaintiff,

------

[6] For the sake of brevity, the Court does not detail here the multiple other inconsistencies among the SAC, plaintiffs' representations at oral argument, and the supplemental brief.

it need not accept as true plaintiffs' conclusory statements, threadbare recitation of the elements of their

claims, or legal conclusions. *Iqbal,* 556 U.S. at 678.   Accordingly, the Due Process claim in plaintiffs' first

claim for relief should dismissed.

### (2) Fourth Amendment Search and Seizure (Repossession)

Plaintiffs' second federal claim is also based on defendants' alleged assistance to D.L. Evans Bank

during the repossession of plaintiffs' cattle.  Plaintiffs allege all defendants violated the Fourth Amendment's

prohibition of unlawful search and seizure when defendants, "in the process of assisting the bank in the entry

onto Plaintiffs' lands and seizure of Plaintiffs' cattle, acted without the benefit of a warrant and without

probable cause."  2d Am. Compl., at 28.  In order to make out a search and seizure claim, plaintiffs must

sufficiently allege that defendants, while acting under color of law,  unreasonably searched or seized

plaintiffs' "persons, houses, papers [or] effects."  U.S. Const. am. IV; *see Soldal v. Cook County*, 506

U.S. 56, 61-62 (1992); *Meyers v. Redwood City*, 400 F.3d 765, 770 (9th Cir. 2005).   Individuals

generally have no constitutional claim against a private entity such as a bank that seizes property in a non-

judicial foreclosure or other self-help remedy.   They are not acting under color of state or federal law.

However, in limited cases, courts have found law enforcement officers were "so entangled in a private self-

help remedy" that their intervention and assistance during the act of repossession made them participants

and subjected them to liability under Section 1983 or *Bivens.  Meyers,* 400 F.3d at 771.  For example,

such entanglement was found when sheriff's deputies oversaw a private eviction they knew was illegal

under Illinois law, *Soldal,* 506 U.S. at 71-72, and when an officer accompanied a creditor and acted on

his behalf to prevent a debtor from resisting repossession of a tractor, *Harris v. City of Roseburg*, 664 F.2d 1121, 1127 (9th Cir. 1981). "While mere acquiescence by the police to stand by in case of trouble is insufficient to convert a repossession into state action, police intervention and aid in the repossession" may suffice to constitute a state action. *Harris*, 664 F.2d at 1127; *Meyers*, 400 F.3d at 771.

Here, plaintiffs' allegation of general assistance to the bank and participation in the repossession is vague and conclusory. It is not even clear if any defendants were present during the repossession. Even if the Court were to accept as true plaintiffs' dubious allegations at oral argument that all defendants were present and helped round up the cattle for the bank, plaintiffs fail to state a claim. Plaintiffs fail to allege that defendants acted outside the scope of their official duties as inspectors and safety officers. Accordingly, plaintiffs' second federal claim should be dismissed.[7]

### (3) Failure to Intercede

In their third federal claim, plaintiffs assign liability to all defendants on the basis that they "had an

---

[7]  As part of this claim, plaintiffs also allege that defendants violated plaintiffs' rights to judicial due process "avoiding Plaintiffs right to contractual due process remedies against non-judicial seizures of properties" and to enforce any remedies under their contract with the bank. 2d Am. Compl., at 28-29. As explained above, in order to state a due process claim, plaintiffs must allege facts showing defendants, while acting under color of law, deprived plaintiffs of a liberty or property without due process. The Court construes plaintiffs as arguing that, through their alleged participation in the bank's repossession, defendants deprived plaintiffs of a property interest without due process. However, as the Court already noted, plaintiffs fail to allege specific acts by defendants showing they did anything to directly deprive plaintiffs of the cattle. Rather, plaintiffs allege the bank seized the property with "encouragement" and unspecified participation from defendants. Furthermore, it does not appear plaintiffs were, in fact, deprived of any contractual remedies with their bank. Plaintiffs conceded at oral argument that they already sued the bank in state court for the bank's actions in repossessing the cattle. Tr., 88-89.

opportunity to correct false reports, false information in affidavits, or to intercede on behalf of Plaintiffs and prevent the unlawful and unreasonable violations of the Fourth and Fourteenth Amendments" and "[a]ll defendants fail to do so." 2d Am. Compl., at 32.  Plaintiffs do not cite any legal authority for this argument. *See*  Idaho Defs.' Mot. Dismiss, at 9 (Doc. #50); Pls.' Resp. Idaho Defs.' Mot. Dismiss (Doc. #62); Tr. 29-30.  Moreover, it is not clear from the allegations of the SAC what constitutional right is invoked.

The Court notes that in very narrow circumstances, courts have recognized "that police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen" and the officers have a "realistic opportunity" to do so.  *Cunningham v. Gates*, 229 F.3d 1271, 1289-90 (9th Cir. 2000), *as amended* (Oct. 31, 2000) (quoting *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir.1994), *rev'd on other grounds,* 518 U.S. 81 (1996)).  However, as U.S. District Court Judge Michael Mosman recently explained, all the relevant "cases show a Fourth Amendment duty [to intercede] that is clearly limited to the context of excessive force" and police officers.  *Dental v. City of Salem/Salem Police Department*, 2015 WL 1524476, at *5 (D. Or. Apr. 2, 2015) (listing and examining cases).  This case is not a Fourth Amendment excessive force case.  Plaintiffs do not allege that police defendants had a realistic opportunity to intercede to prevent other officers from using excessive force on plaintiffs and failed to do so.  Rather, plaintiffs claim that all defendants, most of whom are not police officers , failed to intervene to prevent alleged search warrant violations, destruction of plaintiffs' business relationships, and wrongful search and seizure.  Courts have not recognized a constitutional duty to intercede in those circumstances.  Moreover, even if there were such a duty, plaintiffs fail to provide

concrete factual allegations showing that defendants had a "realistic opportunity" to intervene.[8]  Plaintiffs'

claims for failure to intercede should be dismissed.

### (4) Conspiracy to Violate Civil Rights

Plaintiffs' fourth federal claim alleges that all defendants participated in a conspiracy to violate

plaintiffs' constitutional rights.  2d Am. Compl., at 34-36.  Under Section 1983, in order to make out a

claim for conspiracy, plaintiffs must allege facts that "demonstrate the existence of an agreement or meeting

of the minds to violate constitutional rights."  *Crowe v. Cty. of San Diego*, 608 F.3d 406, 440 (9th Cir.

2010); *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002).  In addition, they must establish an actual

deprivation of rights resulting from that agreement.  *Ting v. United States*, 927 F.2d 1504, 1512 (9th

Cir.1991); *Avalos v. Baca*, 517 F. Supp. 2d 1156, 1170 (C.D. Cal. 2007) aff'd, 596 F.3d 583 (9th Cir.

2010).   "To be liable, each participant in the conspiracy need not know the exact details of the plan, but

each participant must at least share the common objective of the conspiracy."  *Franklin,* 312 F.3d at 441;

*United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir.1989).

Here, plaintiffs make conclusory statements but fail to allege any facts that would establish either

an express or implied agreement among defendants to violate plaintiffs' constitutional rights.  The mere fact

---

[8]  This is in keeping with the clear rule that "vicarious liability is inapplicable to *Bivens* and §
1983 suits."  *Iqbal*, 556 U.S. at 676; *see Dental*, 2015 WL 1524476, at *3.  "Liability under section
1983 [or *Bivens*] arises only upon a showing of personal participation by the defendant." *Taylor v.
List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Thus, "a plaintiff must plead that each Government-official
defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S.
at 676.

that defendants cooperated in an interstate investigation does not establish a conspiracy.  Nor does plaintiffs' supplemental memorandum shed any additional light on this claim.  Plaintiffs cite to Third Circuit Jury Instructions regarding "conspiratorial relationships with governmental agencies." Pls.' Suppl. Br., at 10-11.  This is neither helpful nor sufficient to cure the defects in plaintiffs' claim for conspiracy. Accordingly, the conspiracy claims should be dismissed.

### (5) Execution of Warrant

In their fifth and sixth federal claims, plaintiffs allege constitutional violations relating to the acquisition and execution of a search warrant on plaintiffs' homes and feedlot on September 26, 2012.  In their fifth federal claim, plaintiffs allege all defendants are liable for "improper execution of a warrant." 2d Am. Compl., at 37.[9]  Specifically, plaintiffs allege that in executing the search warrant, "Defendants acted, knowing there were no reason to believe there were any items of contraband or evidence regarding illegal sale of cattle in Plaintiffs' residences." 2d Am. Compl., a 37.  Plaintiffs also claim that the execution of the search itself violated their rights, alleging that "[d]efendants seized items not listed on the warrant or reasonably related to their alleged purpose," failed to return items, damaged items in retaliation, and used "unnecessary force and rigor upon the cattle" causing deaths. 2d Am. Compl., at 37.  Plaintiffs do not indicate what type of constitutional violation they are asserting, but based on the specific allegations, the

---

[9] In the SAC, plaintiffs do not specifically identify the individual defendants who were present when the warrant was executed. Rather, plaintiffs name Malheur County Sheriff's Office, USDA, and Oregon Brand Department.  In plaintiffs' supplemental brief, they name individuals as being present when the warrant was executed, but they still fail to allege that individuals committed any specific acts. Pls.' Suppl. Br., at 3.

Court construes the claim as one under the Fourth Amendment.

The Fourth Amendment prohibits not only a warrantless search but a search "pursuant to an ill-begotten or otherwise invalid warrant." *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011). However, a claim that defendants acted in bad faith in executing an improper warrant is difficult to establish. Officers who conduct a search pursuant to a warrant generally may not be held liable in a Section 1983 or *Bivens* action if a reasonable officer would have believed the search comported with the Fourth Amendment. *Anderson v. Creighton*, 483 U.S. 635, 641(1987); *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012). For officers who obtain and execute warrants, the "warrant confers a shield of immunity lost only in rare circumstances, even for mistakenly issued warrants." *Armstrong v. Asselin*, 734 F.3d 984, 992-93 (9th Cir. 2013). As the Supreme Court recently explained, "Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or in objective good faith." *Messerschmidt,* 132 S. Ct. at 1245; *United States v. Leon*, 468 U.S. 897, 922-23 (1984). Courts have recognized a narrow exception, which allows suit when "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Messerschmidt,* 132 S. Ct. at 1245 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). For example, the Ninth Circuit allowed a case to proceed against officers who had a valid warrant to search an entire building but failed to limit their search after learning the warrant was mistaken and the suspect resided in only one of the building's multiple units. *Mena v. City of Simi Valley*, 226 F.3d 1031 (9th Cir. 2000).

Here, it is undisputed that a circuit judge signed the search warrant and plaintiffs do not challenge her neutrality.[10]  In fact, plaintiffs state in their supplemental brief: "Based on the information as it was provided in the affidavit by Defendant Speelman (which is 79 pages long), wherein he claimed he had evidence of theft, a Judge could believe him and sign the order for warrant based on its face." Pls.' Suppl. Br., at 4.  Accordingly, the warrant shields defendants against allegations of bad faith unless plaintiffs can allege facts showing the lack of probable cause was so apparent that defendants should have known the search was unconstitutional. *Messerschmidt,* 132 S. Ct. 1235 at 1245.  Plaintiffs do not meet this high bar.  They allege simply that "Defendants acted, knowing there were no reason to believe there were any items of contraband or evidence regarding illegal sale of cattle in Plaintiffs' residence."  2d Am. Compl., at 37.  Not only is this allegation conclusory and lacking in any factual support, it does not address the key issue: objective reasonableness.  The law does not inquire into the subjective intent or knowledge of the defendants but rather it asks whether a reasonably competent officer would have concluded that the warrant was proper.  Plaintiffs have failed to allege facts to support a plausible claim that defendants acted in bad faith in executing the warrant.

As for the claim that the manner of the search violated plaintiffs' rights, the touchstone is again the officers' reasonableness. *United States v. Knights*, 534 U.S. 112, 118-19 (2001); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995).  Even when a valid warrant authorizes a given search,

---

[10]  For clarification purposes, the Court notes that the circuit court judge who signed the search warrant has the same first and last name as the undersigned.  This is an odd coincidence.  The undersigned is not the same individual.

"[e]xcessive or unnecessary destruction of property in the course of [the] search may violate the Fourth Amendment." *United States v. Ramirez*, 523 U.S. 65, 71 (1998). However, given that "officers executing search warrants occasionally must damage property in order to perform their duty . . . only unnecessarily destructive behavior, beyond that necessary to execute a warrant effectively, violates the Fourth Amendment." *Mena*, 226 F.3d at 1041 (quoting *Dalia v. United States*, 441 U.S. 238 (1979)). Again, plaintiffs provide insufficient factual allegations other than generalities to support a claim that the manner of defendants' search violated the Fourth Amendment. Plaintiffs allege that "the contents of the house were left in disarray, items unnecessarily thrown about and damaged in retaliation." 2d Am. Compl., at 37. They further allege that defendants in their search for evidence of cattle theft "used unnecessary force and rigor upon the cattle." 2d Am. Compl., at 37. However, plaintiffs fail to provide details to support their claims that the alleged damage or forceful treatment of cattle was "unnecessary." The SAC's only specific allegation is that "someone had taken Kendra Gillette's article about eartags off the wall and torn it up" and it does not identify which defendant, if any, was responsible. 2d Am. Compl., at 17. Plaintiffs fail to allege sufficient facts to support a Fourth Amendment claim for unconstitutional execution of a warrant. The claim should be dismissed.

**(6) False Information in Warrant Process**

In their sixth claim for relief, plaintiffs make a related Fourth Amendment claim against all the Malheur County defendants, alleging that they "knowingly or recklessly" provided false information in their warrant affidavit, rendering the resulting search warrant invalid. 2d Am. Compl., at 39. Indeed, officers

that procure a warrant through deception violate the Fourth Amendment. *Bravo,* 665 F.3d at 1083; *Ewing v. City of Stockton*, 588 F.3d 1218, 1223-24 (9th Cir. 2009). In order to make out a claim for this sort of violation, plaintiffs "must show that the defendant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause." *Ewing*, 588 F.3d at 1223 (quoting *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004)); *see Bravo*, 665 F.3d at 1083. Plaintiffs must show more than mere "[o]missions or misstatements resulting from negligence or good faith mistakes." *Ewing*, 588 F.3d at 1224 (quoting *United States v. Smith*, 588 F.2d 737, 740 (9th Cir.1978)). Moreover, the knowing or reckless falsehoods must be material. In determining materiality, courts evaluate whether the affidavit, once corrected, would still establish probable cause. *Bravo*, 665 F.3d at 1083-84 (officers violated Fourth Amendment by intentionally or recklessly omitting from a search warrant affidavit the fact that the suspect was incarcerated and could not have committed the crime under investigation); *see, e.g., Chism v. Washington State*, 661 F.3d 380 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 1916 (2012) (plaintiffs made out a claim for Fourth Amendment violation where officers claimed they had evidence that plaintiff had downloaded and purchased child pornography but officers actually had none).

Although plaintiffs bring this claim against all seven Malheur County defendants, they allege that only defendant Speelman wrote the allegedly false affidavit to procure the search warrant. 2d Am. Compl., at 7-8; Pls.' Suppl. Br., at 4. They have not made out a claim against the county or defendants Wolfe, Romans, Johnson, and Wroten. As for the claim against Speelman, plaintiffs cite to page after page in his search warrant affidavit and argue statements made were false or based on speculation. 2d. Am. Comp.,

at 39-42; Pls.' Suppl. Br., at 5-7.  However, these allegations are frustratingly inadequate as they lack any

context.  The SAC lists out alleged inaccuracies without any explanation of how the falsehoods were

material to the circuit judge's finding of probable cause.  Not only do plaintiffs fail to properly allege

materiality in the SAC, they inexplicably choose to omit the warrant affidavit from the SAC even though

they admit that their allegations would "certainly make more sense to the Court if the Affidavit for Search

Warrant was available." Pls.' Suppl. Br., at 7.  In their first amended complaint, plaintiffs incorporated

much of Speelman's affidavit and the resulting search warrant.  After noting that plaintiffs' handwritten

arguments in the margins were inappropriate, the Court advised plaintiffs to submit clean copies of the

exhibits with the SAC. Order on Mot. Dismiss 1st Am. Compl., at 8 n. 7 (Doc. #42).  Plaintiffs failed to

do so.  However, even if plaintiffs had complied and included clean copies of the affidavit and warrant

submissions, the documents would not support plaintiffs' claim.  The Court has reviewed plaintiffs' earlier

incomplete submissions of portions of the search warrant affidavit.  The affidavit contains allegations,

undisputed by plaintiffs, which could support a finding of probable cause.[11]

---

[11] The affidavit comprises 79 pages of complex and detailed allegations.  The complexity stems
from the fact that the cattle business is heavily regulated and anti-theft laws generally require
documented inspections when cattle change ownership or move to another state.  Much of the affidavit
concerns plaintiffs' alleged violations of inspection requirements.  Although plaintiffs dispute many
allegations in the affidavit, they leave others unchallenged.  In some cases, they admit to the alleged
conduct but deny its illegality.  For example, the affidavit alleges plaintiffs purchased certain cattle at
auction in Idaho and completed the required inspection certificates, stating they were consigning the
cattle to a slaughter plant.  However, rather than transport the cattle to the named slaughter plant,
plaintiffs took them elsewhere.  Compl. Ex. 1, at 11(Doc. #1-3) (search warant aff.).  The affidavit cites
Idaho Code 25-221A which makes it "unlawful to divert livestock or other animals from destinations
consigned on a certificate of veterinary inspection, other approved certificate or permit without notifying

Moreover, the SAC does not allege facts, that if true, would show that Speelman "deliberately or recklessly" included the alleged inaccuracies in the affidavit. Rather, the SAC mostly alleges that other defendants told Speelman false information about their investigations, and he then added the secondhand information to his affidavit. 2d Am. Compl., at 7-10, 16. The SAC does not allege facts indicating that Speelman was even aware the information was false. Thus, plaintiffs allege only that the warrant affidavit was inaccurate. This is not a constitutional offense. Plaintiffs fail to allege that the warrant lacked probable cause but for defendant's false information. In addition to materiality, plaintiffs failed to allege facts showing that defendant acted deliberately or recklessly. Accordingly, this claim should be dismissed.

### (7) Supervisory Liability

Plaintiffs bring their seventh claim against Malheur County Sheriff Brian Wolfe, alleging supervisory liability for officers' violations of plaintiffs' constitutional rights. 2d Am. Compl., at 44. Under Section 1983, each defendant may only be held liable for his or her own conduct, and thus a supervisor may not be held liable for the actions of a subordinate under a theory of *respondeat superior*. *OSU Student All. v. Ray*, 699 F.3d 1053, 1069 (9th Cir. 2012). A "supervisor is liable for the acts of his subordinates if the supervisor participated in or directed the violations, or knew of the violations [of subordinates] and failed

---

the [state officials] within seventy-two (72) hours following the diversion." Plaintiffs do not dispute these allegations as untrue. In fact, plaintiffs submit Kendra Gillette's personal notes which address the specific allegation as follows: "We can change our mind about where our cattle go. We bought them. We owned them." Pls.' Suppl. Br. Ex. 3, at 4 (Doc. #76-3).

to act to prevent them." *Preschooler II v. Clark Cty. Sch. Bd. of Trustees*, 479 F.3d 1175, 1182 (9th

Cir. 2007); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989); *see Menotti v. City of Seattle,* 409

F.3d 1113, 1149 (9th Cir. 2005).  At the complaint stage of the proceedings, a plaintiff "does not need

to show with great specificity how each defendant contributed to the violation of his constitutional rights.

Rather, he must state the allegations generally so as to provide notice to the defendants and alert the court

as to what conduct violated clearly established law." *Preschooler II*, 479 F.3d at 1182.

Here, plaintiffs allege that defendant Wolfe had a duty to oversee the defendant sheriffs' deputies

and that he knew about and condoned their conduct in violation of plaintiffs' rights.  Plaintiffs offer the

following alleged facts to support the statement that defendant Wolfe knew about and acquiesced to the

constitutional violations: (1) plaintiffs notified Malheur County of tort liability on August 1, 2012; and (2)

defendant, on Nov. 15, 2011, apologized to plaintiffs' attorney for his deputies' overzealous conduct. 2d

Am. Compl., at 15, 44.  However, unless there are sufficient allegations that Sheriff Wolfe's subordinates

actually violated the constitution, these  allegations are of no avail.  Notification of tort liability and an

apology about his  deputies  searching through plaintiffs' garbage do not rise to the level of knowingly

acquiescing to constitutional violations.

In addition, both of these events allegedly giving rise to defendant Wolfe's supervisory liability occurred

outside of the applicable two-year statute of limitation. *Douglas v. Noelle*, 567 F.3d 1103, 1109 (9th Cir.

2009) (statute of limitations).  Plaintiffs' supervisory claim against Sheriff Wolfe should be dismissed.

**(8) Municipal Liability**

In their eighth federal claim, plaintiffs seek to recover from defendant Malheur County on a theory of municipal liability, also known as a *Monell* claim. 2d Am. Compl., at 46; *see Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). In order to establish municipal liability under Section 1983, a "plaintiff must allege that the action inflicting injury flowed from either an explicitly adopted or a tacitly authorized city policy." *Gibson v. United States*, 781 F.2d at 1337-38 (citing *Monell,* 436 U.S. at 690-91). In order to state such a claim, a plaintiff must allege facts plausibly showing that (1) plaintiff was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to plaintiff's constitutional right; and (4) the policy was the "moving force behind the constitutional violation." *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir.1996); *Pullen-Hughes v. City of Portland, Or.*, 2011 WL 7646236, at *2 (D. Or. Nov. 2, 2011) *report and recommendation adopted*, 2012 WL 1116458 (D. Or. Apr. 2, 2012). Plaintiffs must identify the specific municipal policy or custom that caused their injury. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403-04 (1997). Moreover, where the municipality did not officially approve a defendant's offending conduct, plaintiffs must allege facts establishing that the relevant "practice was so widespread as to have the force of law." *Id.*; *Rivera v. Cty. of Los Angeles*, 745 F.3d 384, 389 (9th Cir. 2014). In this case, plaintiffs allege that "Malheur County has adopted a de facto policy of knowing condonation of its officers' misconduct." 2d Am. Compl., at 47. The allegations included in this claim are conclusory. Plaintiffs' only factual allegations to support the existence of such a policy are broad statements that defendants violated their constitutional rights– allegations which, as previously explained, lack merit. This

tautology is not enough to make out a *Monell* claim for municipal liability. This claim should be dismissed.

### (9) First Amendment

In their First Amendment claim, plaintiffs allege that all the defendants "acted in retaliation" against them, because plaintiffs were advocating for the adoption of a proposed change in USDA policy which would "negatively affect their jobs and income." 2d Am. Comp., at 50. "[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). In order to establish a claim of retaliation in violation of the First Amendment, a plaintiff must establish: (1) that the defendant's conduct would chill a person of ordinary firmness from future First Amendment activity, and (2) that the official's desire to chill the speech was a "but-for" cause of the official's unlawful conduct. *Ford v. City of Yakima*, 706 F.3d 1188, 1193 (9th Cir. 2013); *Papas v. Leonard*, 2012 WL 1445853, at *9 (D. Or. Apr. 25, 2012) *aff'd,* 544 F. App'x 764 (9th Cir. 2013). Thus, a plaintiff "must allege facts ultimately enabling him to prove the elements of retaliatory animus as the cause of injury, with causation being understood to be but-for causation." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 917 (9th Cir. 2012). "It may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Id.* (quoting *Hartman*, 547 U.S. at 260)).

Even if defendants disagreed with plaintiffs position advocating for a change in USDA rules, there

are no factual allegations beyond conclusory statements that such a change would affect any of defendants'

jobs.  These allegations are mere conjecture.  Nor are there any factual allegations, other than conclusions,

that such advocacy by plaintiffs led defendants to engage in an investigation of plaintiffs' cattle operation.

In fact, plaintiffs' timeline does not support such an argument.  The SAC and supplemental brief allege that

the defendants' investigation began in 2010, before the Gillettes' alleged advocacy in 2011.[12]  While it is

possible that the Gillettes' advocacy began earlier, plaintiffs have not alleged that.  At oral argument the

Court asked plaintiffs for the dates of any other advocacy that could have sparked the investigation.  Tr.,

at 19-21.  Plaintiffs were unable to provide further dates either at oral argument or in their subsequent

supplemental brief.  Tr., at 18-21; Pls.' Suppl. Br., at 9-10 (Doc. #76).[13]  Plaintiffs fail to allege facts, that

if true, would show a violation of their First Amendment rights, and thus this claim should be dismissed.

Ultimately, plaintiffs have failed to state any federal claim for relief in the SAC.

### D. Dismissal with Prejudice

---

[12]  In the SAC, plaintiffs allege two examples of advocacy, Kendra Gillette's newspaper piece and alleged statements at a Cattlemen's Association meeting.  Both occurred in late 2011.

[13]  Plaintiffs submitted as exhibits copies of two public comment submissions seemingly made online to the USDA, but these contained no dates.  Sweeney Gillette Decl., at 3 (Doc. #66); Kendra Gillette Decl. Ex. 1, at 17 (Doc. #77-1).  Moreover, plaintiffs did not mention or explain these submissions in any of their briefs.  The Court notes that submissions of this sort of extrinsic evidence are generally inappropriate in the context of a Rule 12(b)(6) motion to dismiss.  *United States v. Corinthian Colleges,* 655 F.3d 984, 998-99 (9th Cir. 2011); *Lee v. City of Los Angeles,* 250 F.3d 668, 688-90 (9th Cir. 2001).  That said, even if the submissions were permissible here, they would not affect the Court's analysis in this case.  Without dates, the submissions do not clarify or help establish a coherent timeline of the First Amendment retaliation claims alleged by plaintiffs.

Ordinarily, courts should dismiss a defective complaint without prejudice.  "However, the district court may exercise its discretion to deny leave to amend due to 'undue delay, bad faith or dilatory motive on part of the [plaintiff], repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . and futility of amendment.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892-93 (9th Cir. 2010) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *Trackwell v. Hampton*, 2011 WL 6935325, at *2 (D. Or. Dec. 29, 2011).  Courts should consider these *Foman* factors in determining whether to dismiss claims with prejudice and effectively deny any leave to amend.  *Johnson v. Buckley,* 356 F.3d 1067, 1077 (9th Cir. 2004).  A court can dismiss with prejudice on the basis that it would be futile to allow further amendment.  *Novak v. United States,* 795 F.3d 1012, 1020 (9th Cir. 2015); *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008); *Johnson* 356 F.3d at 1077.  Moreover, a "district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1072 (9th Cir. 2008); *In re Vantive Corp. Sec. Lit.*, 283 F.3d 1079, 1097-98 (9th Cir. 2002), *abrogated on other grounds as recognized in, Gebhart v. S.E.C.*, 595 F.3d 1034, 1041 (9th Cir. 2010); *Zucco Partners, LLC, v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009).  "It is well-established that a court may dismiss an entire complaint with prejudice where plaintiffs have failed to plead properly after repeated opportunities." *Destfino*, 630 F.3d at 959.

For example, in a case in which plaintiffs already had "three opportunities to plead their best possible case," the Ninth Circuit held it was reasonable "for the district court to conclude that it would be

pointless to give the plaintiffs yet another chance to amend." *Vantive Corp.,* 283 F.3d at 1097.  Courts

have found futility in situations when plaintiffs were given the opportunity but failed to offer any additional

facts that might cure the deficiencies in the complaint.  *Id.*, at 1098 (citing *In re Silicon Graphics Inc. Sec.*

*Litig.*, 183 F.3d 970, 991 (9th Cir. 1999), and *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir.

1993)); *Metzler,* 540 F.3d at 1072; *Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th Cir. 2002).  "Such

a failure is a strong indication that the plaintiffs have no additional facts to plead." *Vantive Corp.*, 283 F.3d

at 1098; *see Zucco Partners*, 552 F.3d 981 at 1007; *Collegenet, Inc. v. XAP Corp.*, 2005 WL 708406,

at *1, 1 n.1 (D. Or. Mar. 28, 2005).

Here, plaintiffs had three opportunities to plead their case plus a further opportunity to address

weaknesses in the SAC with a supplemental brief.  Plaintiffs began this case by filing a 126-page complaint

which included 107 pages of exhibits.  Compl. (Doc. #1).  Soon after, plaintiffs filed a 151-page first-

amended complaint ("FAC").  1st Am. Compl., at 2 (Doc. #5).  After the Court dismissed the FAC,

plaintiffs filed a 68-page SAC, which seemingly dispensed with the 107 pages of exhibits but continued to

reference them as if they were incorporated. 2d Am. Compl. (Doc. #43).  On January 15, 2016, the Court

heard oral argument on the current motions to dismiss the SAC.  Tr. (Doc. #75).  During the arguments

which lasted several hours, the Court informed plaintiffs the SAC was deficient, explained deficiencies, and

gave plaintiffs opportunities to clarify and support their claims with arguments and factual allegations.

Furthermore, the Court agreed to allow plaintiffs to file a supplemental brief addressing deficiencies in the

SAC.  Plaintiffs filed a 13-page supplemental brief along with 36 pages of appendices and exhibits.  Pls.'

Suppl. Br. (#76, 76-1, 76-2, 76-3, 76-4); Kendra Gillette Decl. (Doc. #77, 77-1). At this point, plaintiffs have submitted hundreds of pages of pleadings and exhibits, and yet they fail to make out a federal claim. "Such a failure is a strong indication that the plaintiffs have no additional facts to plead."[14] *Vantive Corp.*, 283 F.3d at 1098.

When plaintiffs filed their FAC, defendants raised many of the same legal deficiencies they bring now in the present motions to dismiss. Although the Court dismissed the FAC on Rule 8 grounds, the order advised plaintiffs the FAC was "legally insufficient." The Court instructed plaintiffs to address, in their SAC, the deficiencies raised in defendants' motions to dismiss. Order on Mot. Dismiss 1st Am. Compl., at 4-5 n. 4 (Doc. #42). Plaintiffs failed to do so. For example, in urging the Court to dismiss the FAC, Idaho defendants wrote, "Plaintiffs' First Amended Complaint tells a long story involving a large number of Defendants that, rather than specifically identifying which defendant said and did what and linking those facts to the elements of a legal claim, lumps all Defendants together by alleging a 'conspiracy.'" Idaho Defs.' Reply Mot. Dismiss FAC, at 5 (Doc. #41). The same criticism could be leveled at the SAC, which

---

[14] Further indication can be found in the nature of plaintiffs' most recent submissions. In an effort to rescue their deficient SAC, plaintiffs submitted with their supplemental brief 36 pages of appendices and exhibits, including 21 pages of plaintiff Kendra Gillette's personal notes about the case. Pls.' Suppl. Br. Ex. 3 (Doc. #76-3); Kendra Gillette Decl. Ex. 1 (Doc. #77-1). Extrinsic evidence is generally not appropriate on a motion to dismiss, and theses submissions are inadmissible for other reasons as well. Plaintiffs submitted similarly inadmissible evidence with their first two complaints in the form of margin notes handwritten on a copy of the government's search warrant affidavit. The Court recognizes that, if given the opportunity to amend, plaintiffs might be able to appropriately incorporate the contents of these submissions into the pleading. However, the contents of these submissions do not help make out plaintiffs' federal claims. The Court finds no factual allegations, even in plaintiffs' pages of inadmissible notes, sufficient to support a constitutional claim.

fails to remedy this deficiency.  In fact, the Court raised this problem repeatedly at oral argument, telling

plaintiffs' counsel at one point, "your pleading is incredibly defective in terms of telling me who, what, when,

where, and what was going on" and later, "you can't just say, 'all the defendants did this,' without giving

some more detail."  Tr., at 29, 90; *see* Tr., at 20-23, 29-30, 32-33, 37, 81-82, 86, 88, 90, 96-98, 101,

105.  At oral argument, the Court laid out for plaintiffs key deficiencies in the SAC and provided them an

opportunity to file a supplemental brief.  Although the supplemental brief acknowledged the Court's

concerns about the lack of specificity, it failed to remedy the deficiency.  Prior to oral argument, the Court

considered granting plaintiffs' leave to amend.  However, after careful review of the oral argument

transcript, plaintiffs' multiple complaints, supplemental brief, and numerous other submissions, it is clear that

further amendments would be futile.[15]  Accordingly, the Court should dismiss plaintiffs' federal claims with

prejudice.

### III. State Law Tort Claims

There remain five state law tort claims: trespass to chattel, conversion, negligence, tortious

interference with business relations, and intentional infliction of emotional distress.  Plaintiffs brought their

case in federal court on federal question jurisdiction and sought supplemental jurisdiction over plaintiffs'

---

[15]  Futility alone is sufficient grounds to dismiss a complaint with prejudice.  That said, other *Foman* factors also weigh in favor of denying any further leave to amend.  For one, bad faith may be a concern.  As noted earlier, the Court is troubled by plaintiffs' counsel's conflicting accounts of the bank repossession and other key events in this case.  In attempting to cure a deficiency in a complaint, plaintiffs must possess a good-faith factual basis for alleging additional facts.  Furthermore, plaintiffs filed this case more than a year-and-a-half ago and have yet to state a claim for relief.  Further amendment would not only be futile but would prejudice defendants.

state law claims under 28 U.S.C. § 1367.  2d Am. Compl., at 2.  Section 1367 grants the Court discretion to decline supplemental jurisdiction over state-law claims in a variety of circumstances, including when the Court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. 1367(c).  Moreover, the Supreme Court and Ninth Circuit advise dismissal in such a situation, holding that "the balance of the factors . . . point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988); *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir.1997) (en banc); *see, e.g.*, *Crane v. Allen*, 2012 WL 602432, at *10 (D. Or. Feb. 22, 2012).

Here, having dismissed all federal claims, the Court should decline to exercise supplemental jurisdiction over plaintiffs' remaining state law claims.  Accordingly, plaintiffs' state-law claims should be dismissed without prejudice.  Should plaintiffs see fit, they may refile their state-law claims in the appropriate court.[16]

## RECOMMENDATION

For the above reasons, Defendants' Motions to Dismiss (Doc. #44, 50, 53, 55, and 58) should be GRANTED.  Plaintiffs' federal claims should be DISMISSED with prejudice, and their state law claims

---

[16] In this case, federal law requires state courts to toll the limitations period for the time in which plaintiffs pursue their claims in federal court and for 30 days after dismissal. 28 U.S.C. § 1367(d); *Jinks v. Richland Cnty., S.C.*, 538 U.S. 456, 459 (2003).  The Court notes that many of defendants' challenges to plaintiffs' state law claims, such as plaintiffs' failure to comply with the Federal Tort Claims Act, are well-taken.

should be DISMISSED without prejudice.

## SCHEDULING ORDER

The above Findings and Recommendations will be referred to a United States District Judge for review.  Objections, if any, are due within fourteen days.  If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendations will go under advisement on that date.

IT IS SO ORDERED.

DATED this 3rd day of May 2016.


_____s/ Patricia Sullivan_____
Patricia Sullivan
United States Magistrate Judge

Page 36 - FINDINGS AND RECOMMENDATION